CERTIFIED COPY

In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 17-1055

AYESHA KHAN,

                *Plaintiff-Appellant,*

*v.*

MIDWESTERN UNIVERSITY, an Illinois
not-for-profit corporation,

                *Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-CV-09539 — **John Robert Blakey**, *Judge*.

_____

ARGUED NOVEMBER 6, 2017 — DECIDED JANUARY 16, 2018

_____

Before BAUER, KANNE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Ayesha Khan struggled academically in medical school from the outset. She failed three of her courses in her first year of medical school at The Chicago College of Osteopathic Medicine at Midwestern University. Ordinarily, under the school policy, this would permit the school administrators to dismiss her from the program. They opted not to do so. Instead, they gave Khan a second oppor-

Case: 1:14-cv-09539 Document #: 77 Filed: 03/08/18 Page 2 of 18 PageID #:798
Case: 17-1055  Document: 00713175304  Filed: 03/06/2018  Pages: 18

2  No. 17-1055

tunity to prove herself able to satisfactorily complete the program. She was able to pass the classes on her second try the following year, but she continued to fail new classes in the second year (Block II) of her medical school curriculum. This time, however, she was pregnant and after being expelled, she sued the University, claiming that it had violated the Rehabilitation Act by failing to accommodate her pregnancy-related disabilities. The University filed a motion for summary judgment arguing that even if all the facts she alleged were true, she was not otherwise qualified for the medical school program.

## I.

Because this case comes to us as an appeal of a grant of summary judgment, we take all of the facts and reasonable inferences in the light most favorable to Khan, and look to see whether given those facts, the motion can be granted as a matter of law. See *Aguilar v. Gaston-Camara*, 861 F.3d 626, 630 (7th Cir. 2017). We must resist the trap of assessing the credibility of witnesses, choosing between competing inferences or balancing the relative weight of conflicting evidence. *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014). Sometimes a party makes that task difficult either by lodging speculative claims or engaging in a pattern of behavior that suggests dishonesty. *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). Nevertheless we must remain true to our task on summary judgment and take the facts in the light most favorable to Khan. *Id.* According to Khan, one of her professors, upon learning of her pregnancy, told her that "pregnancy is a full time job that required [her] to sit at home and

Case: 1:14-cv-09539 Document #: 77 Filed: 03/08/18 Page 3 of 18 PageID #:799
Case: 17-1055      Document: 00713175304      Filed: 03/06/2018      Pages: 18

No. 17-1055 3

play mommy." R. 59-2 at 2, Page ID 496; R. 59-1 at 10, Page ID 477.[1] Even assuming, as we must for purposes of this motion, that the comment was uttered, we must assess whether it has any legal relevance for a candidate who, at the time it occurred, had already failed more courses than permitted for students in the program. In other words, "the plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). It is Midwestern's burden to demonstrate that there are no genuine disputes as to any facts that are material to Khan's discrimination claim. *Id.*

Whatever the nature of the discrimination, it has no legal relevance if Khan was not otherwise qualified, with or without accommodations, for the program. The University alleges that she was not. The facts that are relevant to this inquiry, therefore, are those regarding her academic perfor-

---

[1] We pause here to note the difficulties the court had in locating the University's references to the record. Throughout its brief the University cites to Record number 58 for the Defendant's Separate Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, along with attached exhibits. This document appears at Record number 57 in the district court docket. Likewise, the University cites to record number 63 for multiple facts. We believe the University meant to refer to Record number 64, which is the opinion and order of the court. We emphasize here how important it is for the court (and the parties) to have accurate citations to the record lest the court guess incorrectly to what the party is referring.

Case: 1:14-cv-09539 Document #: 77 Filed: 03/08/18 Page 4 of 18 PageID #:800
Case: 17-1055    Document: 00713175304    Filed: 03/06/2018    Pages: 18

4                                                                  No. 17-1055

mance and the policies and practices of the school regarding academic achievement and promotions.

We begin with the latter. Anytime a student fails a class at the University, the University's Preclinical Promotions Committee (Committee) reviews that student's academic progress. According to University policy, each course failure results in an accumulation of "failure equivalents." The University runs on a quarter system, so that if a course is taught over one quarter and the student fails that course, she accumulates one failure equivalent. If the course is taught over two quarters and the student fails, then she will receive two failure equivalents, and so on. If a student accumulates one failure equivalent, the Promotions Committee usually requires the student to repeat that course before she can progress in her studies. If a student accumulates three failure equivalents in a single academic year or four failure equivalents spanning more than one year, the usual practice is that the Promotions Committee dismisses the student. See R. 57-1 at 20, Page ID 214.

Khan matriculated in August 2010. Block I of the medical school program (the first year program) contained sixteen courses. Khan failed three of those initial sixteen courses, for a total of four failure-equivalents, due to the variable credit values of the courses. She also withdrew from five other courses during the third quarter. Khan concedes, and there is no question, that the Committee could have dismissed Khan at this point as she had surpassed three failure equivalents. Instead of dismissing her outright, however, the Committee gave Khan an opportunity to explain her unsatisfactory performance. After explaining that her husband had been ill, the members of the Committee decided to give her a

Case: 1:14-cv-09539 Document #: 77 Filed: 03/08/18 Page 5 of 18 PageID #:801
Case: 17-1055     Document: 00713175304     Filed: 03/06/2018     Pages: 18

No. 17-1055                                                                 5

second bite at the apple. The Committee suspended her, placed her on academic probation, required her to sit out the remainder of the year, and retake all the failed and incomplete courses the following year.

Khan repeated her Block I courses beginning in the autumn term 2011, and this time she earned C's in the classes she had previously failed and advanced to Block II by the end of summer 2012. This did not, however, annul the four failure-equivalents she had already accrued, and they remained relevant for determining Khan's qualifications for remaining enrolled should future difficulties arise.

And those difficulties did arise. By January 2013, Khan was failing three courses in Block II. She also had recently become pregnant and was suffering from many pregnancy-related symptoms including fatigue, nausea, anxiety, and gestational diabetes. In March, Khan requested and was granted a two-week medical leave. To support her request, Khan submitted a letter from her physician stating that he had been treating Khan for depression and anxiety related to her pregnancy and that she required accommodations for her medical issues. After returning from her leave, she requested additional accommodations, supported with a letter from her counselor, including extended time to take exams, a quiet room to take exams, and adjustments to her class schedule and rotations. She also requested a tutor for pharmacology and to reschedule examinations in pharmacology, pathology, and microbiology. Midwestern rescheduled Khan's pathology and microbiology exams (but not pharmacology) and assigned a tutor to assist her with pharmacology. Although Midwestern rescheduled some exams, it did not provide Khan with a quiet room, extend time to take ex-

Case: 1:14-cv-09539 Document #: 77 Filed: 03/08/18 Page 6 of 18 PageID #:802
Case: 17-1055     Document: 00713175304     Filed: 03/06/2018     Pages: 18

6                                                                No. 17-1055

ams, or extend the times between exams. Midwestern did not modify Khan's rotation locations, and as a result, she had to drive over two hours round trip every day which posed a hardship with regard to her pregnancy complications. Khan also claimed that the tutor did not have time to meet with her.

On March 25, 2013, Khan's pharmacology professor, Dr. Prozialeck, sent Khan an email notifying Khan that she had failed seven out of nine exams in his course and requesting that she come meet with him. Khan alleges that during that meeting Dr. Prozialeck criticized her for being pregnant, and told her "there was no scope for her to pass the course as being pregnant is a fulltime job and required her to stay at home and play mommy." R. 59-1 at 10, Page ID 477; R. 59-2 at 2, Page ID 496.

In addition to the nine exams Khan had already taken (seven of which she had failed), she also had to make up a missed exam from earlier in the semester when she was ill. Her professor scheduled the make-up exam for the end of the quarter, in accordance with the course policy. In the meantime, she had to pass the final exam in pharmacology. On the day of that exam, Khan did not arrive until thirty minutes after the testing had begun. After arriving, she explained that she was detained by traffic and requested to take the exam at a later time because of anxiety, nausea, and light-headedness due to her pregnancy. Dr. Prozialeck denied her request. Khan alleges that had Midwestern reviewed the video footage available from that day it would have substantiated Khan's version of events, but she does not say what the video would have revealed. The recitation of the facts in the parties' briefs do not reveal a disagreement

No. 17-1055                                                                7

about the relevant material facts regarding the final exam. According to Khan, she arrived late, informed the professor that she was not feeling well, and he denied her request to take the exam at another time.[2] Khan scored 58% on that final examination rendering it impossible for her to pass the course. The pharmacology professor informed her that there would be no point in taking the make-up test for the eighth pharmacology exam originally scheduled for the end of the term.

By the end of that spring quarter, in May 2013, in addition to pharmacology, Khan had failed two other courses, thereby accruing nine new failure equivalents for a total of thirteen failure equivalents over a two-and-a-half year period. After meeting with Khan, the Committee decided to dismiss her from the program. During the appeal process, Khan alleged that Dean Karen Nichols told her that given the complications related to Khan's pregnancy, Khan could not handle the responsibilities attendant to the life of a physician. R. 59-2 at 4, Page ID 498. Khan also claimed that the president of the University, Dr. Kathleen Goeppinger, informed her that she rejected the diagnosis provided by

---

[2] The only disagreement is whether Khan immediately approached her pharmacology professor upon arriving at the exam site as she alleges, or whether she went to her seat and the professor approached her to ask why she was late, as the University alleges. See R. 59-1 at 11–12, Page ID 478–479. This is not a material conflict. The University also alleged that many students had already completed the exam by the time Khan arrived 30 minutes after the start and therefore, many did not need the full ninety minutes to complete the exam. *Id.* at 11, Page ID 478. Khan states that she has "no ability to know whether other students had already completed their exam." *Id.* This is neither a conflict nor material.

Case: 1:14-cv-09539 Document #: 77 Filed: 03/08/18 Page 8 of 18 PageID #:804
Case: 17-1055    Document: 00713175304    Filed: 03/06/2018    Pages: 18

8                                                              No. 17-1055

Khan's physicians concerning the complications from her pregnancy and that pregnancy is not a disease and does not affect people negatively. *Id.*

Khan filed several claims of discrimination, but the only one that remains for this appeal is her claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et. seq. In the district court, the University moved for Summary Judgment, which the district court granted, concluding, "In the end, no reasonable factfinder could determine, on this record, that Plaintiff was 'otherwise qualified' to continue at the University (with or without the requested accommodations), because absent her alleged handicap issues, she 'still would not have met the requirements' to remain enrolled." *Khan v. Midwestern Univ.*, No. 1:14-cv-9539, 2016 WL 7188161, at *5 (N.D. Ill. Dec. 12, 2016). We review this conclusion de novo, viewing the facts and drawing all inferences in Khan's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Rodrigo v. Carle Found. Hosp.*, No. 16-1403, 2018 WL 258995, at *3 (7th Cir. Jan. 2, 2018).

## II.

The Rehabilitation Act prohibits programs and activities that receive federal assistance (and Midwestern University, like most institutions of higher learning, does receive such funding) from discriminating on the basis of disability. The Act states that, "no otherwise qualified individual with a disability … shall, solely by reason of her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance …" 29 U.S.C. § 794(a).

No. 17-1055 9

Although Khan's statement of the issues focuses on "[w]hether demeaning comments about Plaintiff's pregnancy coupled with differential treatment violates the Rehabilitation Act," her argument seems also to assert that the University failed to accommodate her disability. Appellant's Brief, Issues Presented for Review. Because both claims—discrimination and failure to accommodate—require that she be otherwise qualified for the program, the distinction does not matter in this case.

To adequately set forth a prima facie case of discrimination under the Rehabilitation Act, Khan must establish each and every one of the following elements: (1) She suffers from a disability as defined in the statute, (2) she is qualified to participate in the program in question, with or without a reasonable accommodation, and (3) that she either was excluded from participating in, or denied the benefit of that program based on her disability. *Novak v. Bd. of Trs. of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015) (citing *Jackson v. City of Chicago,* 414 F.3d 806, 810 (7th Cir. 2005)); *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008). The Rehabilitation Act further requires that a plaintiff show that the program in which she was involved received federal financial assistance. *Novak*, 777 F.3d at 974; *see also* 29 U.S.C. § 794(a). In her opening brief, Khan explains at length the nature of her disabilities and the University's discriminatory actions, but fails to adequately address the district court's holding that she was not otherwise qualified for the program.

The district court assumed for the sake of summary judgment, as we do too, that Khan suffered from a disability—that is, disabling pregnancy-related conditions. But even if we accept all of Khan's allegations that she was ex-

Case: 1:14-cv-09539 Document #: 77 Filed: 03/08/18 Page 10 of 18 PageID #:806
Case: 17-1055   Document: 00713175304   Filed: 03/06/2018   Pages: 18

10                                                          No. 17-1055

cluded from the program because of her disability, she cannot succeed on her claim without demonstrating that she was otherwise qualified to remain in the medical school program.

In the context of a university, a person is "otherwise qualified" if she is able to meet all of the program's requirements in spite of her disability, with or without a reasonable accommodation. *Knapp v. Nw. Univ.*, 101 F.3d 473, 482 (7th Cir. 1996) (citing 34 C.F.R. § 104.3(l)(3); 45 C.F.R. § 84.3(l)(3)). Academic decisions, such as whether a student is qualified for, or entitled to promotion within a program, must be left to the broad discretion of the academic institution. See *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985) (citing *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n. 6 (1978) (Powell, J., concurring)) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation."); and *id.* at 90–92 (opinion of the Court)). A court "may not override [the academic institution's judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. *Ewing*, 474 U.S. at 225. See also *Novak*, 777 F.3d at 976 (when assessing discrimination in academic settings, courts must be mindful that "academic judgments often rest on necessarily subjective judgments about academic potential."); *Anderson v. Univ. of Wis.*, 841 F.2d 737, 741 (7th Cir. 1988) ("The [Rehabilitation] Act does not designate a jury, rather than the faculty of the Law School, as the body to decide whether a would-be student is up to snuff.")

No. 17-1055 11

Midwestern's policies provide for dismissal after a student accrues three failure equivalents within one academic year or four failure equivalents over any period exceeding one year. By the time Khan requested accommodations for her disability, she had already accumulated four failure equivalents from the 2010-2011 academic year. She was also irreversibly failing three other courses in Block II, and in two of those classes she had not requested any accommodations. See R. 57-1 at 71, Page ID 265; R. 57-1 at 155–157, Page ID 349–351. All of the classes she failed in Block II spanned the fall, winter and spring quarters. Even taking Khan's claim that she requested accommodations in mid to late March—a fact the University contests—by that time she had already failed approximately seven of nine exams in pharmacology, three out of five exams in osteopathic manipulative medicine, and three out of six exams in Topics in Medicine. See R. 57-1 at 71, Page ID 265; R. 57-1 at 155–157, Page ID 349–351; R. 57-6 at 4, Page ID 432[3]. Moreover, by the time the Committee made the final decision to dismiss Khan from the University, the sinking ship had reached its inevitable grave at the bottom of the sea. Khan had indeed failed all three of those three-quarter-long courses that she had been failing even before the pregnancy, thus accruing an additional nine

---

[3] These are the statistics University counsel asserted at oral argument. Oral Argument at 15:56–16:30, but are also supported by the record cites listed here. Because the date of the accommodation request is contested, it is difficult to determine with precision the exact number of exam failures by the time of the request, but the chart at R. 57-1 at 71, Page ID 265 makes clear that by the time that Khan alleges she made the accommodation request, she had failed a clear majority of exams she took.

new failure equivalents for a total of thirteen failure equivalents, over a two-and-half year period.

Under the University's policy, Khan's four accumulated failure equivalents in the 2010-2011 academic year rendered her eligible for dismissal long before she became pregnant and acquired what she alleges were pregnancy-related disabilities.[4] Khan concedes that these failures alone generally lead to dismissal.

The University, however, used its academic judgment and offered Khan a second chance. The second chance did not erase her prior record but allowed her to prove that she could be successful going forward. This she did not do. Soon after starting her second year of medical school (Block II), she found herself on the cusp of failing yet again. We need not quibble over whether she could have succeeded had she been granted all of the accommodations she requested, or whether the University reasonably denied some of the accommodations, because even under Khan's version of the facts, she was not qualified for the program even before she requested accommodations, and even, in fact, before she became pregnant.

---

[4] Although pregnancy is not, in and of itself, a disability, the Supreme Court's latest guidance on pregnancy-related disabilities in the workplace indicates that pregnant employees who seek to show disparate treatment in the workplace may do so through the application of the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1354 (2015). We can assume, without deciding, that the Rehabilitation Act would treat pregnancy-related disabilities similarly.

No. 17-1055 13

Khan argues that she was otherwise qualified because she had passed several classes in the program including microbiology; infectious diseases and their agents; immunology; pathology; psychiatry; patients physicians and society; practice of medicine; and osteopathic manipulative medicine workshop. The requirements for the medical degree program, however, were not that she pass several classes, but that she not accumulate three failure equivalents in a single academic year or four failure equivalents spanning more than one year. This she could not do. She accumulated thirteen failure equivalents—more than triple the permissible amount.

For the first time in her reply brief, Khan makes the dubious claim that there is a question of fact as to whether she actually did obtain four failure equivalents in her first year. The electronically filed copy of her reply brief states:[5]

> Moreover, a question of fact exists as to whether Ms. Khan in fact obtained four failure equivalents because the courses just began when she had to suspend her participation in the courses due to extenuating circumstances concerning her family that Midwestern acknowledged. Such a fact begs the conclusion as to how Ms. Khan could fail such courses she did not even begin.

Electronically filed Reply Brief at 8. Perhaps there may be a question of fact as to why or how Khan failed her courses,

---

[5] As we discuss below, the electronic and paper copies of the reply brief are not the same.

but Khan has never before pointed to any factual evidence that suggested she did not, in fact, fail those courses in her Block I schedule. To the contrary, Khan had previously repeatedly conceded this fact time and again. In her Response to Defendant's Statement of Undisputed Material Facts she does not deny that she failed three courses (Anatomy 1511-Histology, Anatomy 1550-Gross Anatomy/Embryology, Physiology 1501-Physiology), and that these were worth four failure equivalents. R. 59-1 at 5, Page ID 472. She states only that she was forced to withdraw from three other courses in the following term. *Id.* And in her deposition she conceded "[t]he first year I had issues. I failed anatomy, being one, and physiology being a second course that I remember off the top of my head." R. 57-1 at 97, Page ID 291. Finally, and perhaps most objectively, her transcript unequivocally reports that she failed Anatomy 1511, Anatomy 1550, and Physiology 1501 in her first year. R. 57-1 at 88, Page ID 282. Not only is the argument spurious, and raised for the first time on appeal, but Khan offers not a shred of evidence to support it. A party seeking or opposing summary judgment must support her factual assertions about disputed facts by using citations to point to specific particular parts of the record. *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 808 (7th Cir. 2017) (citing Fed. R. Civ. P. 56(c)(1) & (c)(3)). A party cannot create a dispute of material fact simply by spewing "unsupported ipse dixit [that] is flatly refuted by the hard evidence proffered by" the opposing party. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690–92 (7th Cir. 2010); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that a party opposing summary judgment "must do more than simply

No. 17-1055 15

show that there is some metaphysical doubt as to the material facts.")

It appears that Khan, perhaps having second thoughts about lobbing this new and wholly unsupported claim in a reply brief, scaled back the substance of the claim between the electronic and paper filing of the reply brief. In the paper copy of the reply brief she appears to be walking back the claim, now disputing only the failure of one particular course and not all three. The revised sentence reads:

> Moreover, a question of fact exists as to whether Ms. Khan in fact obtained four failure equivalents because **one** course just began when she **suspended her** participation in **the course** due to the extenuating circumstances concerning her family that Midwestern acknowledged. Such a fact begs the conclusion as to how Ms. Khan could fail **this course** she did not even begin.

Paper copy of filed Reply brief at 8. A court cannot operate and render judgment with a moving target—where some judges may have read one version of a legal argument and other judges a second version. We cannot peruse both documents line by line to determine if there have been changes (although in this case we have). A party must file one brief with the court, and to alter one version without informing the court is unethical.[6] We can have no confidence whatso-

---

[6] It is particularly troubling here because the parties did not file the paper copy of the brief until two days after oral argument. Appellate Rec-

ever in the integrity of the reply brief and therefore we pay it no heed.

Our confidence was further eroded by multiple misrepresentations of the record. The reply brief states that Khan's pharmacology professor, Dr. Prozialeck, advised her that it was mathematically possible for her to pass her second year curriculum by getting a "C" in his course. Reply Brief at 7. For this assertion the reply brief cites to pages R. 57-1 at 142–144, Page ID 336–338 of the record. A careful reading of these pages reveals no such evidence. Not only did Prozialeck not advise Khan that it was mathematically possible for her to pass the Block II coursework, he advised her that it was mathematically impossible for her to pass his singular pharmacology course. If one reads just a bit past the pages to which the reply cites for this proposition it becomes clear that, even according to Khan's own words and testimony, this is the exact opposite of what Prozialeck asserted. Prozialeck unequivocally stated, and Khan did not disagree (she could not, as it was clearly stated in two different e-mails) that it was *not* mathematically possible for her to pass his course.[7] In fact, what Khan alleges in her deposition (just af-

---

ord at 45. Moreover the parties filed the initial reply brief late relying on the magnanimity of the court to grant the motion instanter. *Id.* at 46.

[7] The professor's e-mail dated May 14, 2013, states: "it is mathematically impossible for you to pass the course at this point. The minimum number of points to achieve a passing grade of 70% would be 357 (out of a total of 510 possible points). Even if you scored a perfect 30/30 on the makeup exam, you would only have 338 points, which would be well short of the 357 needed to pass." R. 57-1 at 66–67, Page ID 260–61.

No. 17-1055 17

ter the pages cited in the reply brief) is not that Prozialeck advised her that that she could mathematically pass anything, but rather that *she* calculated that it might have been mathematically possible for her to pass pharmacology *if* she had appealed to the Committee to allow her to retake the final exam, and *if* they agreed to allow her to retake the exam, and *if* she passed the final exam (a final exam in a class in which she had failed eight of the previous ten exams), and *if* she also passed the makeup exam that she had missed. R. 57-1 at 146–48, Page ID 340–42. The assertion that Prozialeck advised her that she could pass the second year curriculum is both false and fantastical. Once again, the reply brief makes assertions without facts supporting it and, more egregiously by asserting facts incorrectly.

The district court correctly found that there were no genuine disputes on issues of material fact. Khan failed more courses than permitted under the policy. Most of her failures—enough to qualify her for dismissal—occurred before the onset of the disability she claimed and her request for accommodations. Allowing Khan a second chance to take her first year medical school courses again did not make her qualified for the program. She was still unqualified under the policy of the school; the school simply allowed an un-

---

His follow up e-mail, sent after she continued to request a time to take the make-up exam, reiterates: "As I told you in my previous message, it is mathematically impossible for you to pass the course, even with a perfect score on the missed exam. The reality is that you failed the course … The fact that you still want to take the makeup exam suggests that you might not fully understand or be accepting of this situation." R. 57-1 at 66, Page ID 260.

qualified student a chance to prove herself qualified going forward. Khan was unable to do so. She continued to fail courses, including courses for which she had not requested any accommodations. Khan failed other courses for which she was given accommodations. Khan argues that she was not given the full panoply of accommodations she requested, but we need not reach the issue as to whether the accommodations provided were reasonable and sufficient. Khan was not qualified for the program long before the question of accommodations even arose.

Even assuming that the facts as presented by Khan occurred as she says they did, by the terms of the school's policies, she was not otherwise qualified for the program. The district court's grant of summary judgment for Midwestern University is AFFIRMED.